## Richmond

ROBERT W. AKERS, ET AL.

v.

JAMES T. BARNES OF WASHINGTON, D.C., INC.

Record No. 811139.

April 27, 1984.

Present: Carrico, C.J., Cochran, Poff, Compton, Stephenson and Thomas, JJ., and Gordon, Retired Justice.

*Walter H. Hylton, III (Bean, Kinney, Korman & Hylton*, on brief), for appellants.

*Gary W. Swindell (Repetti, Murphy & Evans, P.C.*, on brief), for appellee.

THOMAS, J., delivered the opinion of the Court.

The basic issue in this appeal is whether the trial court erred in concluding that a permanent loan commitment, secured by a broker, was in substantial compliance with the terms of the brokerage agreement under which the broker was operating. Appellants contend that the commitment deviated from the brokerage agreement in two significant respects. We agree. Therefore, we will reverse the decision of the trial court and enter final judgment for appellants.

The brokerage agreement in question was entered into between Robert W. Akers and C. Gordon Zeeman as "Owner" and James T. Barnes of Washington, D.C., Inc. (Barnes), as "Broker." Akers and Zeeman sought permanent financing for a ten-unit condominium development. The agreement gave Barnes the exclusive right

to obtain a commitment "according to the general terms specified in paragraph 2." The agreement went on to specify conditions related to Barnes' earning its commission:

> If a commitment is obtained *substantially in accordance with the terms contained in paragraph 2 of this agreement* . . . or, if the Broker locates a lender ready, willing and able to make such a commitment . . . the Broker will be entitled to, and Owner agrees to pay, a commission in an amount equivalent to 1% of the amount of the loan.
>
> . . . .
>
> The Broker's commission shall be deemed earned, and due and payable upon issuance of the commitment.

(Emphasis added.) The italicized language lies at the heart of this case and directs our attention to paragraph 2 of the agreement.

Paragraph 2 sets forth the terms of the agreement. The terms included the following: type of loan, amount, interest rate, term of loan, commitment fees, term of commitment, and guarantees. With regard to the interest rate it stated, in pertinent part, as follows:

> Permanent loans at the higher of 2% above the gross FHLMC 60 day auction rate, 30 days prior to closing or the lender's prevailing commercial mortgage rate.

In essence, the interest term called for a free floating interest rate, one able to move up or down with the market. Moreover, though paragraph 2 is silent as to any presale requirements, it was established by parol evidence, with no objection from Akers and Zeeman, that Barnes was authorized to "bring back" a commitment containing a presale requirement of a maximum of 50% of the condominium units to be offered for sale.

Barnes secured an oral commitment for permanent financing which, among other things, required 65% presales of the condominium units and provided for an interest rate of 2% above the average weighted gross FHLMC* 60-day auction rate at the time of settlement of each individual unit, with a floor of 14%. If these two provisions are in substantial compliance with the brokerage agreement, then Barnes is entitled to its commission. If not,

---

* Federal Home Loan Mortgage Corporation.

Barnes gets no commission and must return a $10,000 good faith deposit made by Akers and Zeeman when the brokerage agreement was signed.

In resolving this case, we must first determine what is meant by "substantial compliance." Although it does not appear that the Court has heretofore defined this phrase, one of the cases cited by Akers and Zeeman is instructive with regard to the meaning of the phrase. In *Hummer* v. *Engeman*, 206 Va. 102, 141 S.E.2d 716 (1965), a real estate broker contended that he was entitled to a commission on a sale of realty for securing a buyer whose offer was rejected by the seller. The seller contended, among other things, that the offer from the buyer secured by the complaining broker deviated from the terms of the listing. The Court compared the offer to the listing in two respects. First, it noted that whereas the offer provided for "a release of 40 acres to be selected by the purchaser in consideration of the cash down payment and additional acreage to be released at $1,200 per acre," the listing "did not provide for any release of land." *Id.* at 107, 141 S.E.2d at 720. Second, the Court noted that whereas the offer provided for payment of the first installment on or before four years from settlement, the listing provided that interest only was to be paid annually for the first 3 years and that payments curtailing the note were to be made beginning with the fourth year after settlement and continuing through the tenth year after settlement. *Id.* at 107-108, 141 S.E.2d at 720. The Court concluded that the offer "did not conform to the material terms of the listing." *Id.* at 108, 141 S.E.2d at 720. We held that the broker was not entitled to a commission, reversed the trial court, and entered final judgment for the seller. *Id.* at 108-109, 141 S.E.2d at 720.

*Hummer* suggests that the materiality of the difference between the commitment and the brokerage agreement, in this appeal, is pertinent to the question of substantial compliance. In essence, a minor, trivial difference can be tolerated whereas a material difference cannot. In this regard, *Hummer* appears in harmony with cases from other jurisdictions which have actually sought to define "substantial compliance." One such case is *Newcomb* v. *Schaeffler*, 131 Colo. 56, 279 P.2d 409 (1955), where the court defined the phrase as follows:

Substantial compliance with reference to contracts, means that although the conditions of the contract have been *deviated from in trifling particulars not materially detracting from the benefit the other party would derive from a literal performance*, he has received substantially the benefit he expected, and is, therefore, bound to pay.

*Id.* at 62, 279 P.2d at 412 (emphasis added). We think this definition is well considered. Therefore, we will review the facts of this case in light of these legal principles.

■ In its final order, the trial court concluded that even though the brokerage agreement was silent as to a presale requirement, the inclusion of a presale requirement in the oral commitment "was no deviation from the brokerage contract." However, the court did not go further to consider whether a 65% presale requirement was in substantial compliance with the maximum 50% presale requirement agreed to by Akers and Zeeman.

Here, the evidence was uncontradicted that both Akers and Zeeman were adamantly opposed to any presale requirement and urged Barnes to pursue other means of satisfying prospective lenders' desires for such requirements. The evidence established further that only after considerable persuasion on the part of Barnes did Akers and Zeeman reluctantly agree to a presale requirement of 50%. This was clearly their maximum. Under the circumstances of this case, any presale requirement in excess of 50% was obviously unacceptable to Akers and Zeeman. It is manifest, therefore, that the 65% presale requirement contained in the oral commitment was not a trivial difference. On the contrary, it was a material difference which significantly detracted from the benefit Akers and Zeeman expected to receive under their brokerage contract. Consequently, the presale requirement in the commitment was not in substantial compliance with that agreed upon.

■ With regard to the interest rate, the trial court concluded that the interest rate set forth in the commitment did not deviate from the brokerage contract. The court recited no factual support for this conclusion. The court simply said that the rate contained in the commitment was, "[i]f anything . . . more favorable to the borrower or developer than the ones contained in the brokerage contract." However, the issue here is not whether the commitment was more or less favorable to the Owner than the requirements of the brokerage agreement. The issue in this case is whether the

commitment was in substantial compliance with the interest rate provision agreed to between Owner and Broker.

The facts established that the interest rate on the permanent financing would not be determined for 12 to 18 months after the commitment issued, because the building first had to be built and the required number of units sold. This means that the parties were called upon to predict interest rates in the future. Under the commitment, the prospective permanent lender sought to guard against a drop in interest rates, 12 to 18 months in the future, by installing an interest floor of 14%. On the other hand, Akers and Zeeman were content to gamble on lower rates in the future by leaving the rate free to float with the market. These two approaches are entirely different: one approach is completely open to the market while the other approach contains a built-in hedge. We do not think that this difference is trivial. On the contrary, this difference could lead to dramatic differences in the interest that might be charged when the permanent loans were made. In our view, Akers and Zeeman had a right to enter an agreement subject to market forces and this is so whether or not the court thought another rate would be more favorable to them. On these facts, we conclude that the interest rate contained in the commitment was not in substantial compliance with the interest rate requirement of the brokerage agreement.

■ We hold, therefore, that the trial court erred in concluding that the commitment secured by Barnes was in substantial compliance with the brokerage agreement. Consequently, we will reverse the judgment in favor of Barnes on its counterclaim and enter final judgment thereon in favor of Akers and Zeeman. With regard to Akers and Zeemans' claim for the return of their $10,000 good faith deposit, we will reverse the trial court's adverse judgment and enter judgment in favor of appellants in the amount of $10,000.

*Reversed and final judgment.*