COURT OF APPEALS OF VIRGINIA


Present:  Judges Elder, Powell and Senior Judge Coleman
Argued at Richmond, Virginia


PSYCHIATRIC SOLUTIONS OF VIRGINIA, INC., d/b/a
  WHISPER RIDGE BEHAVIORAL HEALTH
  SYSTEM - CHARLOTTESVILLE
                                                          OPINION BY
v.      Record No. 2060-08-2                      JUDGE LARRY G. ELDER
                                                          MAY 19, 2009
PATRICK W. FINNERTY, DIRECTOR,
  COMMONWEALTH OF VIRGINIA
  DEPARTMENT OF MEDICAL ASSISTANCE SERVICES


              FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                            Melvin R. Hughes, Jr., Judge

            John B. Mumford, Jr. (Kathryn E. Kransdorf; Hancock, Daniel,
            Johnson & Nagle, P.C., on briefs), for appellant.

            Elizabeth A. McDonald, Special Counsel (Robert F. McDonnell,
            Attorney General; David E. Johnson, Deputy Attorney General;
            Kim F. Piner, Senior Assistant Attorney General, on brief), for
            appellee.


        Psychiatric Solutions of Virginia, Inc. (appellant), doing business as Whisper Ridge

Behavioral Health System - Charlottesville, appeals from a decision rendered under the Virginia

Administrative Process Act that it was overpaid for services provided to Medicaid patients under

a contract with Virginia's Department of Medical Assistance Services (DMAS).  Appellant

contends DMAS did not contest that the services at issue were provided and complained only

about the method appellant used to document the services.  Under these circumstances, contends

appellant, the only issue is one of contract law, and the evidence compels a holding that, despite

these minor deficiencies in documentation of some of the services, it fulfilled its contractual

duties to DMAS to an extent entitling it to full payment under the terms of the contract.  DMAS

contends both that contract law principles are inapplicable in this regulatory matter and, in any event, that the shortcomings in appellant's documentation were more than mere technical deficiencies.

For the reasons that follow, we hold contract principles applied to the interpretation of the provider agreement and that, under settled principles of contract law, appellant would be entitled to payment if its noncompliance did not amount to a material breach of the agreement. Nevertheless, the agency's factual findings, which appellant does not challenge on appeal, compel the conclusion that appellant's ongoing deficiencies in documenting the execution of a specific component of the integrated treatment plan for each of twenty randomly selected patients constituted a material breach of the provider agreement. On this basis, we conclude the circuit court did not err in upholding DMAS's retraction of the general inpatient treatment fees for twenty patients for a period of approximately 29 weeks each.[1] Thus, we affirm.

I.

BACKGROUND

DMAS, under the guidance of the Director of Medical Assistance Services, is the state agency responsible for administering Medicaid, a state medical assistance program funded by both the state and federal governments. The director of DMAS is required by statute to "[a]dminister [the] state plan and receive and expend federal funds therefor in accordance with all applicable federal and state laws and regulations." Code § 32.1-325(D)(1); see 42 C.F.R. §§ 430.0, 430.10. The director is also "authorized to . . . [e]nter into agreements and contracts with medical care facilities . . . and [various] health care providers where necessary to carry out

---

[1] These fees included, in one lump sum per patient, costs such as food, lodging, and certain therapeutic group treatment interventions administered by medical technicians. They did not include the fees DMAS paid for separately-billed, individual and group psychotherapy provided by licensed therapists.

the provisions of [the] state plan."  Code § 32.1-325(D)(2).  As a condition of the receipt of federal funds, applicable federal regulations require execution of such agreements, which must include the condition that the provider will "[k]eep any records necessary to disclose *the extent of services* the provider furnished to recipients."  42 C.F.R. § 431.107(b)(1) (emphasis added).

In 2003, appellant acquired the Whisper Ridge facility in Charlottesville, a 60-bed inpatient psychiatric facility for adolescents 13 to 17 years old, and executed a provider participation agreement in which it agreed to care for patients under DMAS's Virginia Medical Assistance Program.  The provider agreement contained the following additional terms:

> 3.  The applicant agrees to keep such records as DMAS determines necessary. . . .
>
> 4.  The provider agrees to care for patients at [a specified rate].
>
> 5.  . . .  Should an audit by authorized state or federal officials result in disallowance of amounts previously paid to the provider by DMAS, the provider will reimburse DMAS upon demand.
>
>        *      *      *      *      *      *      *
>
> 7.  The applicant agrees to comply with all applicable state and federal laws, as well as administrative policies and procedures of DMAS as from time to time amended.
>
>        *      *      *      *      *      *      *
>
> 9.  All disputes regarding provider reimbursement . . . shall be resolved through administrative proceedings conducted at the office of DMAS . . . .  These administrative proceedings and judicial review of such administrative proceedings shall be pursuant to the Virginia Administrative Process Act.

In 2006, DMAS audited appellant's records for services billed to Medicaid for twenty randomly selected patients covering various periods between August 1, 2004, and February 27, 2006.  DMAS audited an average total of about 29 weeks of records for each of those twenty patients.  In the course of the 2006 audit, DMAS identified multiple problems it denoted as "[b]illing errors," including "fail[ure] to properly document with respect to certain of the

- 3 -

residents at issue that a minimum of 21 distinct treatment intervention sessions [as required by

DMAS's Psychiatric Services Manual, hereinafter the manual, the 2004 manual, or the 2005

manual,[2]] (excluding individual and family therapy) were provided each week." DMAS auditors

noted as follows in their written report:

> None of the records reviewed contained documentation of the
> required weekly interventions. [Appellant's] Therapeutic Group
> Activities [Weekly Grid] Form is not sufficient. Documentation of
> the treatment intervention . . . must be child-specific, [and]
> describe how the activities of the session relate to the
> recipient-specific treatment goals, . . . and the child's level of
> participation which will indicate the child's response to the
> intervention. . . . Very few treatment interventions were
> child-specific and/or related to issues identified in the child's
> treatment plan as required.

DMAS disallowed payment for each seven-day period in which the 21 distinct treatment

intervention sessions were not properly documented to have occurred. It concluded that error

alone resulted in an overpayment to appellant of $761,135.60 in Medicaid funds, as documented

by a detailed spreadsheet of errors noted in the records of specified patients.[3]

Appellant disagreed with DMAS's determination and requested an informal fact finding

conference, following which the informal appeals agent upheld DMAS's retraction of payments.

Appellant filed an agency appeal, and the hearing officer heard testimony and argument

in February 2007. Appellant argued its therapeutic group activities grid form provided sufficient

documentation of the 21-interventions requirement but that, even if it did not, the form entries

---

[2] The version of the Psychiatric Services Manual that was in effect when appellant signed
the provider agreement in March 2003 was updated on January 16, 2004, before the audit at issue
[hereinafter the 2004 manual]. The manual was revised and renamed the Psychiatric Services
Provider Manual effective March 4, 2005 [hereinafter the 2005 manual]. Thus the 2004 manual
and the 2005 manual were each applicable to a portion of the audit period. By signing the
provider agreement, appellant agreed to comply with all "administrative policies and procedures
of DMAS *as from time to time amended*." Provider Agreement, ¶ 7.

[3] DMAS noted other things it also termed billing errors, but the only issue in this appeal
is retraction of payment based on the 21-interventions-per-week issue.

"substantially compl[ied]" with the manual's requirements and entitled it to full payment. Appellant offered testimony from Whisper Ridge employee Victoria Waterfield, a licensed clinical social worker who worked first as a therapist and then as clinical coordinator at Whisper Ridge. DMAS offered the testimony of Shelley T. Jones, one of two DMAS employees who performed the audit at Whisper Ridge. Jones's primary job responsibilities included "oversee[ing] residential treatment," "manag[ing] . . . the Psychiatric Services Manual" and "doing updates."

Jones testified, *inter alia*, that, although the 21 interventions had no "professional requirement" and could be provided by high-school-educated mental health technicians, the manual required these interventions to be client-specific, such that "if you have a child who doesn't have a substance abuse problem, we wouldn't expect to see a substance abuse treatment group for that child. If you have a child who has anger management problems, we *would* expect to see an anger management group for that child." (Emphasis added). Jones also explained that documentation for the 21-interventions-per-week requirement was not "just a paper thing" and was necessary to provide information for other staff to review following a shift change and for "the physician [overseeing the adolescent's treatment], who is not on site every day or not on site twenty-four hours a day, to be able to review the documentation and to be able to make judgments about medication, to make judgments about treatment plan changes." Jones testified that other than group psychotherapy notes from about three sessions per week per child, and some substance abuse treatment records at the rate of one or two per child per month, the only documentation she and her co-auditor found for the 21-interventions-per-week requirement was the weekly grid-formatted "therapeutic group activity reports," forms Jones said "were filled out by the children." These forms were deficient, she testified, because they were not developed for the particular child, did not "describe how the activities of the session [held] relate[d] to the

Recipient-specific goals" or set out "a plan for the next session," and did not provide "a staff person who did not participate in th[e] session . . . any idea what occurred in this session."

After the parties submitted briefs on the issue, the hearing officer issued a written decision in which she concluded appellant failed to carry its burden of proof on "the 21-per-week planned therapeutic interventions issue." She noted that although "reimbursement for all audited weeks of residential services for the sample of twenty patients . . . was retracted," "reimbursement for individually billed professional sessions, such as individual psychotherapy, family psychotherapy, and group psychotherapy" for those twenty patients was not retracted. The hearing officer found as follows:

> 8. [Appellant's witness] Waterfield . . . discussed the facility's form grid for documentation of "Group Therapeutic Activities" sessions as treatment interventions. She further testified that documenting a treatment intervention in the same manner as documenting an individual therapy session would necessitate spending more time on paperwork and less on supervising and helping the patients. "It would be an onerous task." *On questioning whether the form grid actually documents how the required specific child-related goal of the planned treatment intervention was met, Waterfield responded, "No." Although she elaborated on certain terms used in the form grid,* such as what "active" and what durations of "0 to 30 minutes" are intended to convey, *she did not focus on the requirement that the 21 interventions must be planned in the treatment plan and must be treatments toward a specific goal related to the child, not random instructions to patients to do certain things.*
>
> \* \* \* \* \* \* \*
>
> 13. At all times pertinent to this case, the provider has been required in *Psychiatric Services Manual* Chapter IV, page 15, to develop an active treatment plan that must relate to the admission diagnosis and reflect all of four treatment requirements. Requirement B.1.b. of the treatment plan is for a minimum of 21 distinct **sessions** of appropriate treatment interventions each week, where the 21 "appropriate treatment interventions" may be group therapy with specific topics focused to the patient's needs, insight-oriented and/or behavior modifying and may include play, art, or music therapy, occupational therapy, and physical therapy although those means of treatment must not be the major treatment

modality. Section B.2 sets forth requirements of documentation, obviously for the four requirements for the treatment plan described in B.1 (i.e., B.1.a.-d.). *Those documentation requirements include* progress notes reflecting positive or negative reaction to treatment on a daily basis; continued needs; *concurrent documentation of therapies as they are provided, where the progress notes for* **each session** *must describe how the activities of the* **session** *relate to recipient-specific goals,* the frequency and duration of the **session**, the level of participation in treatment, the type of **session**, *and the plan for the next* **session**, with dated signatures.

14. Counsel for Whisper Ridge contended that the requirements for documentation set out in B.2 applied only to professional individual therapy, family therapy, and group therapy settings. Such an argument ignores the consistent use of the word "session" to describe the 21 distinct[] "sessions" of appropriate treatment interventions each week and to describe what is to be documented—"each session."

15. *By demonstration, example, and testimony, Jones showed that the lack of individualized detail in the form grids failed to comply with the documentation requirements to reflect patient reaction to treatment on a daily basis, the relationship of the treatment to the recipient-specific goals*, the duration of the session, the type of the session, a concurrent signature, and the date of the session (sometimes omitted on the form grids), and *provided no understanding of the benefits of the treatment, the patient's progress with the treatment, or planning for future treatment.*

16. . . . *Jones testified at length, was knowledgeable, consistent at all times, and very credible.*

(Emphases added; citations omitted).

Based on these findings, the hearing officer concluded in part as follows:

The agreement signed by every provider with DMAS specifies that the provider agrees to comply with "all applicable state and federal laws, as well as administrative policies and procedures from DMAS as from time to time amended." . . . The Commonwealth has passed enabling legislation under which DMAS has carried out its federal mandate through its state plan, regulations, and federally required policy manuals. Va. Code § 32.1-325. In executing the participation agreement with DMAS, Whisper Ridge has agreed to comply with these laws, plans, regulations, and policies, where the policy pertaining to Whisper Ridge is the *Psychiatric Services Manual*.

Moreover, the *Psychiatric Services Manual* establishing the terms of the agreement was extant well before Whisper Ridge chose to accept it, as Whisper Ridge did voluntarily in order to receive public remuneration. . . .

In executing the Provider Agreement, Whisper Ridge has been put on notice of the provision in Va. Code § 32.1-325.1(B) that any proceedings, administrative or judicial, are controlled by the Administrative Process Act. In this instance, DMAS has made a case decision finding that Whisper Ridge is "not in compliance with any existing requirement for obtaining . . . a . . . right or benefit." Va. Code § 2.2-4001.

\*　　\*　　\*　　\*　　\*　　\*　　\*

. . . Whisper Ridge's suggestion of a "windfall" by DMAS is contradicted by the fact that only twenty of a total possible census of sixty patients were reviewed for a total period of time that encompasses, on average, fewer than 29 weeks per patient over a two year period. Whereas standard auditing principles would include extrapolation of the population and time specimens to the entire population and total time period, that was not done; thus, any equitable argument of a DMAS "windfall" fails on an audit basis . . . .

\*　　\*　　\*　　\*　　\*　　\*　　\*

Pursuant to Va. Code §§ 32.1-325.1(B) and 2.2-4020, the burden of proof in formal administrative appeals is on the provider. *Whisper Ridge has not carried its burden. By acknowledging that the only documentation of 21 treatment interventions per week per audited child is its inadequate, sketchy form grids, Whisper Ridge has been unable to demonstrate a single example of compliance with the requirements of the Psychiatric Services Manual, Chapter IV, p. 15, §§ B.1.b and B.2.*

\*　　\*　　\*　　\*　　\*　　\*　　\*

DMAS is required to analyze, audit, and determine whether the costs claimed by providers constitute true, reimbursable costs under the Medicaid program. *DMAS has* properly discharged its obligation by a rigorous review of and organization of volumes of records, and *identified the absence of reasonable and appropriate progress notes documenting the 21-per-week planned treatment interventions as required by the Psychiatric Services Manual, Chapter IV, p. 15.* Services not documented cannot be reimbursed, and full retraction is due.

- 8 -

(Emphases added; citations omitted). After the parties submitted their exceptions, the director of DMAS adopted the hearing officer's recommended decision with minor corrections.

Appellant requested circuit court review of the final agency decision, arguing, *inter alia*, that the documentation provision did not apply to the 21-interventions requirement but that, even if it did, appellant's completion of its gridded log sheets constituted "substantial compliance" with that requirement, thereby entitling appellant to payment. DMAS responded that the lack of an "explanation of how [each] session was focused on the child's specific mental health issues" was fatal to appellant's claim. It also noted that in signing the provider agreement, appellant "signed away its ability to bring actions under contract law by agreeing that actions would be brought under the APA, and that state Medicaid law and policy would govern in exchange for payment from DMAS."

The circuit court held the record contained evidentiary support for DMAS's conclusion that the documentation for the 21-interventions requirement was deficient and that appellant's presentation of contrary evidence indicating that the documentation was not deficient did not permit the circuit court to make a different finding. The circuit court also held that whether appellant had substantially complied with the documentation requirement was not controlling because appellant, by signing the provider agreement, agreed to comply with state policies and procedures. Finally, the circuit court concluded that "[e]ven on the question of substantial performance," the record contained "evidentiary support for the agency's determinations of documentation deficiency which the court is not authorized to disturb."

Appellant noted this appeal.

II.

ANALYSIS

On appeal of an agency decision, "[t]he sole determination as to factual issues is whether substantial evidence exists in the agency record to support the agency's decision. The reviewing court may reject the agency's findings of fact only if, considering the record as a whole, a reasonable mind necessarily would come to a different conclusion." Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 242, 369 S.E.2d 1, 7 (1988). In making this determination, "the reviewing court shall take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted." Id.

On appeal of an agency's determination on issues of law, the standards differ. "'If the issue falls outside the area generally entrusted to the agency, and is one in which the courts have special competence, i.e., the common law or constitutional law,'" the court need not defer to the agency's interpretation. Id. at 243-44, 369 S.E.2d at 8 (quoting Hi-Craft Clothing Co. v. NLRB, 660 F.2d 910, 914-15 (3d Cir. 1981)).

> However, where the question involves an interpretation which is within the specialized competence of the agency and the agency has been entrusted with wide discretion by the General Assembly, the agency's decision is entitled to special weight in the courts[, and] . . . "'judicial interference is permissible only for relief against the arbitrary or capricious action that constitutes a clear abuse of delegated discretion.'"

Id. at 244, 369 S.E.2d at 8 (quoting Va. Alcoholic Beverage Control Comm'n v. York St. Inn, Inc., 220 Va. 310, 315, 257 S.E.2d 851, 855 (1979) (quoting Schmidt v. Bd. of Adjustment, 88 A.2d 607, 615-16 (N.J. 1952))).

Based on these principles, we have previously held in a related context that "an appellate court accords great deference to both [DMAS's] factual findings and interpretation of the laws

applicable to 'the reimbursement due qualified providers for their reasonable costs incurred while delivering health care services.'" Beverly Health & Rehab. Servs., Inc. v. Metcalf, 24 Va. App. 584, 592, 484 S.E.2d 156, 160 (1997) (quoting Fralin v. Kozlowski, 18 Va. App. 697, 700-01, 447 S.E.2d 238, 240-41 (1994)) (both involving reimbursement for expenses related to the acquisition and maintenance of nursing *facilities* in the context of functioning as a Medicaid service provider). In this related context, we have also held we "will overturn DMAS's 'interpretation of the statutes and regulations governing Medicaid . . . principles of reimbursement . . . only . . . when found to be arbitrary and capricious.'" Id. (quoting Fralin, 18 Va. App. at 701, 447 S.E.2d at 241).

On appeal, appellant argues it does not challenge DMAS's factual finding that its documentation of the 21 therapeutic interventions required per week for each patient failed to satisfy the manual's requirements. Appellant contends it argues only that the circuit court committed an error of law in upholding the agency's determination that, "under Virginia contract law, this technical deficiency . . . permits DMAS to retract the entirety of payments to Whisper Ridge for each of the twenty Residents . . . , despite the fact that DMAS does not dispute that all Program Services were provided to the Residents – including the Interventions." We hold that, despite appellant's disclaimer, this assignment of error presents both legal and factual issues, which we examine in turn after setting out the regulatory and contractual framework.

The provider agreement appellant executed entitled it to payment of public funds entrusted to DMAS as compensation for providing "a 24-hour-per-day specialized form of highly organized, intensive, and planned therapeutic interventions . . . to treat severe mental, emotional, and behavioral disorders." See 12 VAC 30-130-860(B). By endorsing that document, appellant agreed (a) "to comply with all applicable state and federal laws, as well as administrative policies and procedures of DMAS as from time to time amended," and (b) "to reimburse DMAS" for any

"amounts previously paid" "[s]hould an audit by authorized state . . . officials result in disallowance of [those previously paid] amounts."

As an inpatient psychiatric facility for adolescents eligible for Medicaid reimbursement, Whisper Ridge was a "residential treatment program," defined as a "24-hour, supervised, medically necessary, out-of-home program[] designed to provide necessary support and address the special mental health and behavioral needs of [its] adolescent [patients] *in order to prevent or minimize the need for more intensive inpatient treatment*."  12 VAC 30-130-860(A) (emphasis added).  The program "shall provide a total, 24 hours per day, specialized form of *highly organized, intensive and planned therapeutic interventions* that shall be utilized to treat some of the most severe mental, emotional, and behavioral disorders."  Id. (B) (emphasis added).  Reimbursement requires treatment "[d]esigned to achieve the recipient's discharge from inpatient status *at the earliest possible time*."  42 C.F.R. § 441.154 (emphasis added); see 12 VAC 30-130-850.

To accomplish this goal most effectively, federal and state regulations require that an interdisciplinary team of physicians and other personnel at the facility must develop for each patient a written, individualized plan of care that sets out specific "treatment objectives that must include measurable short-term and long-term goals and objectives, with target dates for achievement," and "[p]rescribe[s] an integrated program of therapies, activities, and experiences designed to meet [stated] treatment objectives related to the diagnosis."  12 VAC 30-130-890(C); see 42 C.F.R. § 441.155 to -.156.  The treatment team must review the plan every thirty days to assure "that services being provided are or were required on a inpatient basis" and to "[r]ecommend changes in the plan as indicated by the recipient's overall adjustment as an inpatient."  42 C.F.R. § 441.155; see 12 VAC 30-130-890(D).

DMAS maintains the manual,[4] which repeats some of these regulations and contains DMAS's guidelines for how to comply with them.  In executing the provider agreement in 2003, appellant agreed to comply with all DMAS policies and procedures and any amendments thereto, clearly encompassing the various versions of the manual.

In keeping with the applicable regulations, the manual required development and maintenance of "an active plan" for each patient that

> [B.1.] must relate to the admission diagnosis and reflect *all of the following*:
>
> a.  A licensed professional . . . provides individual therapy three out of seven days;
>
> b.  *A minimum of 21 distinct sessions (excluding individual treatment, school attendance, and family therapy) of appropriate treatment interventions are provided each week (i.e., group therapy, with specific topics to focus on patient needs; insight-oriented and/or behavior modifying).  Play/art/music therapy, occupational therapy, and physical therapy may be included; however, these modalities of treatment must not be the major treatment modality;*
>
> c.  The family, guardian, caretaker, or case manager is involved on an ongoing basis with treatment planning.  The family, guardian, or caretaker participates in family therapy [on the terms outlined in this subsection, or] documentation must demonstrate why it is not feasible or in the best interest of the child for the family to participate . . . ; and
>
> d.  Active treatment and comprehensive discharge planning for aftercare placement and treatment must begin at admission.

2004 Manual ch. IV, at 15 (emphasis added in subsection (b)); see 2005 Manual ch. IV, at 15 (including language identical in all substantive respects); see also 12 VAC 30-130-890(C)(4) (requiring comprehensive individual plans of care for patients of residential treatment programs that "prescribe[, *inter alia*,] an integrated program of therapies, activities and experiences

---

[4] See supra footnote 2.

designed to meet the treatment objectives related to the diagnosis"). The manual also provided

that medical record documentation must show adherence to the active treatment plan and

> [B.2.] must include *all of the following*:
>
> a. Stabilization or improvement of presenting symptoms with progress notes reflecting positive or negative reactions to treatment on a daily basis;
>
> b. Continued need for skilled observation, structured intervention, and support that can only be provided at the residential level of care;
>
> *c. Concurrent documentation of therapies as provided. Progress notes for each session must describe how the activities of the session relate to the recipient specific goals, the frequency or duration of the session, the level of participation in treatment, the type of session (group, individual), and the plan for the next session. Notes must contain the dated signatures of the providers. Examples of some types of* non-billable *sessions include educational, socialization, recreational, current events, nursing, grooming and substance abuse*; and
>
> d. If the minimum treatment outlined [under the section detailing the required contents of the active treatment plan] is not provided, document why the individual was unable to participate.

2004 Manual ch. IV, at 15-16 (emphasis added in subsection (c)); see 2005 Manual ch. IV, at

15-16. The 2005 update to the manual clarified the documentation expected for the

21-interventions-per-week requirement, providing as follows:

> c. Concurrent documentation of therapeutic interventions *(billable psychotherapy and non-billable interventions that meet the 21 interventions-per-week requirement)* as provided. Progress notes for each session must describe how the activities of the session relate to the recipient-specific goals, the frequency and duration of the session, the level of participation in the treatment, the type of session (group, individual), and the plan for the next session. Notes must contain the dated signatures of the qualified providers. Examples of some types of non-billable sessions include educational, socialization, recreational, current events, nursing, grooming, and substance abuse . . . .

2005 Manual ch. IV, at 15 (emphasis added).  The provider manual also required that appellant

"[m]aintain and retain the business and professional records sufficient to document fully and

accurately the nature, scope, and details of the health care provided" by Medicaid, 2004 Manual

ch. II, at 6, just as required by federal regulations, see 42 C.F.R. § 431.107(b)(1) (requiring in the

provider agreement the condition that the provider will "[k]eep any records necessary to disclose

the extent of services the provider furnished to recipients").

Thus, although the statutes and regulations require an "integrated program" of "highly

organized, intensive and planned therapeutic interventions," and the keeping of detailed records

regarding same, only by signing the provider agreement, a contract, did appellant become

obligated to provide patients with the 21 planned, therapeutic interventions per week and to

document those interventions in the specific manner set out in the manual.  Accordingly, in

determining whether any deficiencies in the provision of these 21 interventions per week or the

documentation thereof support a retraction of payment, ordinary contract law principles apply.

Nevertheless, we hold as a matter of law, based on DMAS's factual findings made pursuant to

the Administrative Process Act, that contract law does not support appellant's retention of the

Medicaid payments at issue.

The Virginia Supreme Court has recognized the following principles:

> Generally, a party who . . . breach[es] . . . a contract is not entitled to enforce the contract.  An exception to this rule arises when the breach did not go to the "root of the contract" but only to a minor part of the consideration.
>
> If the . . . breaching party committed *a material breach*, however, that party cannot enforce the contract.  *A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract*.

Horton v. Horton, 254 Va. 111, 115, 487 S.E.2d 200, 203-04 (1997) (quoting Federal Ins. Co. v.

Starr Elec. Co., 242 Va. 459, 468, 410 S.E.2d 684, 689 (1991)) (emphases added) (citations

- 15 -

omitted).[5]  Here, DMAS's factual findings, which are supported by substantial evidence in the

agency record and were upheld by the circuit court on review under this standard, compel a

ruling as a matter of law that appellant's method of documenting the 21-interventions

requirement constituted a material breach of the agreement.[6]

Appellant contends "DMAS does not dispute that all Program Services," "including the

Interventions," "were provided to the Residents" and that the evidence, viewed in the light most

favorable to DMAS, shows only a "trifling" technical deficiency in the documentation of those

---

[5] Appellant also relies upon the Supreme Court's holding in Akers v. James T. Barnes of Washington, D.C., Inc., 227 Va. 367, 371, 315 S.E.2d 199, 201 (1984), for the principle that "substantial compliance" with the terms of the contract was sufficient to entitle it to payment.  In Akers, however, which involved a brokerage agreement, the agreement itself expressly provided that a commission would be paid the broker "[i]f a commitment [to finance a condominium development] is obtained *substantially in accordance with the terms contained in paragraph 2 of this agreement*."  Id. at 369, 315 S.E.2d at 200.  In appellant's case, by contrast, the provider agreement appellant executed contained no such provision.  To the extent substantial compliance or substantial performance principles nevertheless apply under Virginia law to contracts like DMAS's provider agreement, see, e.g., Davis v. Holsten, 270 Va. 389, 394-97, 621 S.E.2d 101, 104-05 (2005) (holding that although substantial performance principles may apply to construction and sales contracts in Virginia, they "will not be applied to an escrow agreement" "unless the agreement provides otherwise"), such principles are merely the inverse of the material breach principles set out in the text, see Restatement (Second) of Contracts § 237, cmt. d (1981) ("The considerations in determining whether performance is substantial are those listed in § 241 for determining whether a failure is material."); id. § 241 (listing "significant" factors to consider "[i]n determining whether a failure to render or offer performance is material," including "(b) the extent to which the injured party can be adequately compensated for that benefit of which he will be deprived").  Thus, a conclusion that appellant materially breached the agreement necessarily precludes a holding that appellant substantially performed under it.  We need not decide here whether any breach or only a material breach of the provider agreement permitted DMAS to demand repayment because, as set out infra in the text, the evidence, viewed in light of the agency's factual findings, compels the conclusion that the breach was material.

[6] The circuit court examined whether appellant exhibited "substantial performance" under the contract and did not use the language, "material breach."  Applying the "substantial performance" language, the court concluded, "Even on the question of substantial performance," the record contained "evidentiary support for the agency's determinations of documentation deficiency which the court is not authorized to disturb."  This constituted a ruling that the finding of documentary deficiency, which was supported by substantial evidence in the record, prevented the circuit court from concluding appellant substantially performed under the terms of the contract.  In other words, the circuit court held the documentary deficiency was a material breach.  See supra footnote 5.

sessions. However, DMAS, in addition to "show[ing] that the lack of individualized detail in the form grids failed to comply with the documentation requirements," also articulated how that failure significantly impacted appellant's ability to provide to its "exceedingly mentally ill" residents the around-the-clock, "specialized form of highly organized, intensive and planned therapeutic interventions," 2004 Manual ch. IV, at 13; 2005 Manual ch. IV, at 13, for which DMAS had paid appellant. This "lack of individualized detail in the form grids" constituted a failure, *inter alia*, "to reflect patient reaction to treatment on a daily basis and the relationship of the treatment to the recipient-specific goals," information required to be set out in each patient's treatment plan and reviewed and revised every thirty days.

DMAS employee Shelley Jones, whose testimony the hearing officer found "knowledgeable, consistent . . . and very credible," testified the documentation requirement was not "just a paper thing" and that its primary purpose was to have information available for other staff to review following a shift change and for "the physician, who is not on site every day or not on site twenty-four hours a day, to be able to review the documentation and to be able to make judgments about medication, to make judgments about treatment plan changes." Jones explained that in the absence of such information on the grid sheets, the records of the 21 interventions per week per patient, a significant component of each individual's inpatient treatment, "*provided no understanding of benefits of the treatment, the patient's progress with the treatment, or planning for future treatment.*" (Emphasis added). Absent such information, appellant's treatment team was deprived of information important to the stated goals of "improv[ing] the recipient's condition or prevent[ing] further regression *so that the [inpatient] services will no longer be needed,*" 42 C.F.R. § 441.152 (emphasis added), and "achiev[ing] the recipient's discharge from inpatient status *at the earliest possible time*," 42 C.F.R. § 441.154 (emphasis added); see 2004 Manual ch. IV, at 15; 2005 Manual ch. IV, at 14. Thus, appellant

failed as a matter of law to establish an entitlement to payment for the 21 interventions per week provided as a part of the general inpatient treatment fee.

DMAS's factual finding that appellant's lack of "reasonable and appropriate progress notes documenting the 21-per week planned treatment interventions" interfered with the ability to achieve the stated goal of stabilization or improvement allowing a discharge from inpatient treatment is supported by substantial evidence in the record. This finding compels the holding that these documentary deficiencies constituted a material breach of the provider agreement. Thus, we hold DMAS's decision to retract payment of the inpatient treatment fee for twenty individuals for a period of approximately 29 weeks each— but not for the separately-billed professional sessions for individual, family, and group psychotherapy for these patients— was not arbitrary and capricious.

III.

For these reasons, we conclude the circuit court did not err in upholding DMAS's conclusion that appellant was overpaid for Medicaid services. Thus, we affirm.

Affirmed.