COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Felton, Judges Petty and McCullough
Argued at Alexandria, Virginia

1ST STOP HEALTH SERVICES, INC.,
  d/b/a 1ST STOP HOME CARE

v.      Record No. 1418-13-4

DEPARTMENT OF MEDICAL
  ASSISTANCE SERVICES,
  CYNTHIA B. JONES, DIRECTOR

OPINION BY
JUDGE STEPHEN R. McCULLOUGH
APRIL 8, 2014

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Lorraine Nordlund, Judge

Martin A. Donlan, Jr. (J. Nelson Wilkinson; Williams Mullen, on
briefs) for appellant.

Jennifer L. Gobble, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General; Rita W. Beale, Deputy Attorney
General, Kim F. Piner, Senior Assistant Attorney General, on brief),
for appellee.

The Director of the Department of Medical Assistance Services issued a decision

retracting $128,736.72 in payments made to 1st Stop Health Services, Inc. The decision was

based on 1st Stop's failure to maintain adequate documentation. 1st Stop appealed to the Circuit

Court of Fairfax County, which affirmed in part and reversed in part. 1st Stop now appeals to

this Court, raising the following eight assignments of error.

> 1.      The Final Agency Decision ["FAD"] is not supported by
> substantial evidence as it ignores the evidence of 1st Stop and
> testimony of 1st Stop's Administrator, which the Hearing Officer
> found to be undisputed.
>
> 2.      The FAD erred under Va. Code Ann. § 32.1-325.1.B
> because it failed to adopt the Hearing Officer's Recommended
> Decision ["RD"] when such RD complied with applicable law and
> DMAS policy.

PUBLISHED

3. The FAD erred under Va. Code Ann. § 2.2-4020.C because it does not give due deference to the findings of fact made by the Hearing Officer.

4. The FAD erred in not applying contract standards of law to determine whether any deficiency in 1st Stop's documentation constituted a material breach of the Provider Agreement, and if they did, in not requiring DMAS to prove the amount of damages incurred by DMAS that arose from such breach.

5. The FAD is arbitrary and capricious and constitutes an abuse of the Director's discretion because it fails to apply applicable contract law in that all the services required to be provided to each recipient was provided and enabled recipients not to be placed in a nursing home during the audit period; any deficiency in the DMAS-90s, the Aide Records and other documentation was not substantive and/or was corrected; DMAS failed to show that any harm occurred to any recipient or that any damage was sustained by DMAS in any material or substantive amount; and a basis for forfeiture of all provider payments was not established because DMAS and its recipients received all of the services for which payments were made and avoidance of a nursing home admission was accomplished.

6. The FAD erred in not applying contract law in this case because 1st Stop only became subject to Medicaid laws, regulations and policies by contracting with DMAS through its Provider Agreement.

7. The FAD erred in not applying Virginia's breach of contract materiality standards in this case, in that the Director failed to find:

   a. the extent to which the injured party will be deprived of the benefit which it reasonably expected;

   b. the extent to which the injured party can be adequately compensated for the part of the benefit of which it was deprived;

   c. the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

   d. the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account all of the circumstances, including any reasonable assurances; and

> e.      the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.
>
> 8.      The FAD is arbitrary and capricious and constitutes an abuse of discretion because the conduct at issue here does not involve any substandard quality of care and all services were provided as authorized by DMAS.

For its part, DMAS assigns error to the trial court's application of contract principles. We affirm the decision of the circuit court.

BACKGROUND

Under the Elderly or Disabled with Consumer Direction (EDCD) Waiver program, elderly or disabled individuals can receive services that enable them to remain in their homes or communities instead of residing in a nursing home. See 12 Va. Admin. Code § 30-120-900. 1st Stop Health Services is an enrolled provider of services under the Medicaid program. 1st Stop provides both "personal care" and "respite care" services.

Personal care services involve assisting a patient at home with activities such as bathing, eating, toileting, reminding the patient to take medication, and housekeeping. 12 Va. Admin. Code § 30-120-950. Unlike "personal care" services, which focus on assisting the patient, "respite care" services are designed to provide temporary relief to an unpaid caregiver. 12 Va. Admin. Code § 30-120-960(C). The services provided as respite care, however, are the same. Id. The Department of Medical Assistance Services, or DMAS, issues a "Preauthorization Notice" to the provider authorizing the provider to bill for a predetermined number of hours for each patient.

A contract, known as a Provider Agreement, spells out 1st Stop's obligations. The contract itself is not lengthy, but it incorporates by reference applicable regulations and Provider manuals. The Provider Agreement requires 1st Stop to "provide services in accordance with the Provider Participation Standards published periodically by DMAS in the appropriate Provider

- 3 -

Manual(s) . . . ."  The Provider Agreement also specifies that the provider "agrees to keep such records as DMAS determines necessary."  1st Stop also must "comply with all applicable state and federal laws, as well as administrative policies and procedures of [DMAS] as from time to time amended."

To ensure compliance with policy and regulations, DMAS conducts "utilization reviews" and financial reviews.  According to the Elderly or Disabled with Consumer Directed Services Manual ("EDCD Manual"), the purpose of utilization reviews

> is to determine whether services delivered were appropriate, whether services continue to be needed, and the amount and kind of services required.  Utilization review is mandated to ensure that the health, safety, and welfare of the individuals are protected and to assess the quality, appropriateness, level, and cost-effectiveness of care.

EDCD Manual, Chapter 6, p. 4.  DMAS also can conduct a "financial review and verification of services . . . to ensure that the provider bills only for those services which have been provided in accordance with DMAS policy and which are covered under the EDCD Waiver."  EDCD Manual, Chapter 6, p. 12.  The Manual goes on to specify that "[a]ny paid provider claim that cannot be verified *at the time of review* cannot be considered a valid claim for services provided."  Id. (emphasis added).

By law, "[t]he provider shall maintain all records for each individual receiving personal care services."  12 Va. Admin. Code § 30-120-950(E).  The provider must correctly prepare and maintain the DMAS-90 form, the required form for providers of personal care services.  Id. Moreover, the EDCD Manual specifies that "[i]f an individual receives personal care and respite care services, one record may be maintained, but separate sections must be reserved for the documentation of the two services."  EDCD Manual Chapter 4, p. 33.  The Manual also provides that "[a]n accurately signed and dated DMAS-90 is the only authorized documentation of services provided for which DMAS will reimburse.  DMAS will not accept employee payroll

- 4 -

time sheets in place of the DMAS-90." EDCD Manual, Chapter 4, p. 36. Chapter 6 of the EDCD Manual again notes that with regard to personal care and respite care services, "[o]nly DMAS-90s will be used by DMAS to verify services delivered and billed to DMAS. No other documentation (e.g., time sheets) will be used for verification of services." EDCD Manual, Chapter 6, p. 12.

The EDCD Manual repeatedly warns Providers that they "will be required to refund Medicaid" if they are found to have, among other things, "failed to maintain records to support their claims." EDCD Manual, Chapter 2, p. 7. Chapter 6 of the EDCD Manual, dealing with audits or "Utilization Reviews," again specifies that

> [p]roviders will be required to refund payments made by Medicaid if they are found to have billed Medicaid contrary to law or regulation, *failed to maintain any record or adequate documentation to support their claims*, or billed for medically unnecessary services.

EDCD Manual, Chapter 6, p. 1 (emphasis added). The same chapter provides that "EDCD Waiver services that fail to meet DMAS criteria are not reimbursable." Id. at 14. Among other specifically listed non-reimbursable items, the Manual lists "[i]nsufficient documentation to support services billed." Id. at 15. "If services billed to and paid by DMAS are not documented on the DMAS-90, DMAS will require the provider to refund Medicaid." EDCD Manual, Chapter 6, p. 12-13. Likewise, the regulations warn providers that "noncompliance with DMAS policies and procedures may result in a retraction of Medicaid payment or termination of the provider agreement, or both." 12 Va. Admin. Code § 30-120-930(A)(17).

An auditor hired by DMAS conducted a "utilization review" of the personal care services provided by 1st Stop. The audit did not cover respite care services. To support its billing, 1st Stop provided the auditor with CDs containing scanned DMAS-90 forms. The auditor found a number of deficiencies in the documentation submitted by 1st Stop. Two of those deficiencies

are at issue in this appeal. First, the auditor concluded that some of the records provided did not contain the required DMAS-90 form for the dates billed, or the hours billed did not match the hours documented on the DMAS-90 form. Second, the auditor found in some instances that "the DMAS-90 Form is not clearly marked in order to determine the type of service provided (*i.e.,* personal care or respite care)." Based on these and other documentation deficiencies, the auditor identified an overpayment of $128,987.64 and recommended a retraction. The Director of DMAS demanded that 1st Stop return the money, and 1st Stop complied.

1st Stop appealed the auditor's findings with the DMAS Appeals Division. At the formal appeal hearing, 1st Stop presented evidence to show that, notwithstanding its flawed documentation, it had not overbilled DMAS. 1st Stop offered its billing records which, when combined with the DMAS-90 forms provided to the auditor, showed that it had billed within the hours authorized for each patient in the respective categories of personal care and respite care services. Uche Njoku, the general manager of 1st Stop, admitted she was aware of the need to maintain two separate DMAS-90 forms, one for respite care and one for personal care. She acknowledged that some of the forms were not labeled personal or respite care, but testified that this deficiency was later corrected. She further explained that, to reduce paper, 1st Stop decided to scan and save their DMAS-90 forms electronically. However, 1st Stop did not separate personal and respite care forms. Therefore, the electronic personal care folders contained both personal care and respite care forms. Likewise, the respite care folders contained documentation for both respite care and personal care. These commingled electronic records were provided to the auditor.

The hearing officer concluded that the order to retract payment should be reversed. First, the hearing officer, not mincing words, found that 1st Stop's documentation was "abysmal." The hearing officer also found that the auditors "arrived at the correct decision based on what

documentation they had to audit." He stated that he "fully understands why the auditors in this matter reached the conclusion that the records were not sufficient at the time of the audit to justify certain payments and therefore resulted in a requested retraction."[1] Based on the additional evidence presented at the hearing, however, the hearing officer concluded that 1st Stop "did, in fact, perform the personal care services for which it billed in this matter." Specifically, the hearing officer accepted Ms. Njoku's testimony as well as "summary billing records . . . which were not available to the auditors at the time of the audit." Based on this evidence, the hearing officer concluded that "[1st Stop] did not bill for personal care services in this matter for which it was not preauthorized to bill." The hearing officer essentially viewed the recordkeeping provisions of the contract as immaterial and grounded his decision on whether 1st Stop had actually billed DMAS for services not provided or authorized.

The Director reversed the decision of the hearing officer and ordered 1st Stop to reinstate in full an overpayment of over $128,000. The Director specifically noted that "[t]he hearing officer's determination that the DMAS-90 is not necessary to verify billing records is in contradiction to DMAS regulation and policy."

1st Stop then appealed this final agency decision to the Circuit Court for Fairfax County. The court affirmed the Director's decision in part and reversed it in part. 1st Stop then appealed to this Court.

ANALYSIS

I. THE DIRECTOR'S DETAILED DECISION IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

1st Stop initially relies on the factual findings by the hearing officer to contend that the Director's decision was flawed. 1st Stop points to Code § 2.2-4020(C), which provides that

---

[1] 1st Stop does not challenge these factual conclusions.

- 7 -

"[t]he agency shall give deference to findings by the presiding officer explicitly based on the demeanor of witnesses." In addition, Code § 32.1-325.1(B) provides:

> The Director shall adopt the hearing officer's recommended decision unless to do so would be an error of law or Department policy. Any final agency case decision in which the Director rejects a hearing officer's recommended decision shall state with particularity the basis for rejection.

The construction of this statute is a question of law, which we review *de novo*. Louis Latour, Inc. v. Va. Alcoholic Bev. Contr. Bd., 49 Va. App. 758, 766, 645 S.E.2d 318, 322 (2007).

This argument need not detain us long. First, nothing in the decision of the hearing officer suggests that he based his decision "explicitly" on the demeanor of the witnesses. Under a plain language reading of Code § 2.2-4020(C), that statute has no applicability. Second, and more fundamentally, the Director's decision was not based upon a factual disagreement with the hearing officer's decision. The hearing officer noted that "[t]he facts in this matter are essentially undisputed. The application of legal principles to those facts is highly disputed." The Director acknowledged that the services were provided. However, the Director disagreed with the hearing officer's "determination that the DMAS-90 is not necessary to verify billing records." The Director also specifically disagreed that 1st Stop had "bourne its burden of proof regarding Error Codes 901 and 914," a legal conclusion. Therefore, the Director did not overstep the bounds set by Code § 2.2-4020(C) or Code § 32.1-325.1(B).[2]

1st Stop also contends that the Director failed to state "with particularity the basis for her rejection" of the hearing officer's decision. Appellant did not raise this issue in its petition for appeal to the circuit court. The trial court, not appellant, first broached the question of whether the Director's decision satisfied the statutory requirement of particularity. Assuming without

---

[2] The circuit court similarly noted that "the Director accepted the factual findings of the Hearing Officer and rejected the legal analysis applied to those facts."

deciding that the court's raising of the issue *sua sponte* is sufficient to preserve the issue for our review, we find the argument without merit. The Director's written decision spans 13 single-spaced pages and articulates in detail why the Director disagreed with the hearing officer on matters of law and policy. We hold that the Director stated the basis of her rejection with ample particularity.

## II. THIS COURT WILL NOT REWRITE THE CONTRACT TO EXCISE THE DETAILED DOCUMENTATION REQUIREMENTS 1ST STOP AGREED TO FOLLOW.

1st Stop contends that notwithstanding its "abysmal" documentation practices, it should nevertheless prevail. We find each argument advanced in support of reversal unpersuasive.

### A. Standard of review

With regard to factual issues, the task before us is to determine "'whether substantial evidence exists in the agency record to support the agency's decision. The reviewing court may reject the agency's findings of fact only if, considering the record as a whole, a reasonable mind would necessarily come to a different conclusion.'" John Doe v. Virginia Bd. of Dentistry, 52 Va. App. 166, 175, 662 S.E.2d 99, 103 (2008) (quoting Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 242, 369 S.E.2d 1, 7 (1988)). See also Code § 2.2-4027. This standard is designed "to give great stability and finality to the fact-findings of an administrative agency." Virginia Real Estate Comm'n v. Bias, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983). As a general proposition, we review the agency's legal conclusions *de novo*. Code § 2.2-4027. In making this determination, the reviewing court "shall take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted." Id.

### B. The importance of maintaining documentation for Medicaid providers

Medicaid outlays represent an enormous share of the Commonwealth's budget. According to DMAS, Virginia spent approximately 7.2 billion dollars for its Medicaid program

in 2011, out of a total state budget for that year of 38.7 billion dollars.[3]  These enormous sums

are paid to thousands of providers throughout Virginia, for a wide range of services.

Additionally, DMAS ordinarily pays a claim when it is submitted – as, in fact, occurred here.  To

ensure accountability, the state conducts after-the-fact audits.  In order for these audits to

function efficiently, uniformity and clarity of documentation is essential.  In addition,

maintaining an accurate and organized contemporaneous record of services provided is crucial

because it is difficult to reconstitute the nature or hours of the services provided months or years

after the fact.  Finally, notations about the care provided enable other caregivers and medical

personnel to determine the status or progress of a patient.

In short, maintaining documentation as required by the Provider Agreement is crucial if

the Commonwealth is to operate a program of Medicaid's scope in an efficient and fiscally

responsible manner.  As noted above, applicable regulations and the EDCD Manual, which is

incorporated by reference into the Provider Agreement, include provisions designed specifically

to ensure this adequate and uniform documentation.

C.  The supplemental documentation and testimony provided at the hearing does not cure 1st
       Stop's failure to maintain adequate documentation at the time of the audit.

The hearing officer, relying on the testimony and additional documentation provided by

1st Stop at the hearing, concluded that despite 1st Stop's failure to maintain documentation as

specified in the EDCD Manual, "the Provider did not bill for personal care services in this matter

for which it was not preauthorized to bill or for which it did not provide services."  For the

hearing officer, the regulatory and contractual obligations governing documentation were

irrelevant.  What mattered under his analysis was whether evidence gathered and presented after

---

[3] See Senate Finance Committee, Health and Human Resources:  The Basics of
Medicaid, Recent Growth and Future Challenges (Nov. 17, 2011); see also Virginia Department
of Planning and Budget, 2011 Executive Budget Document (Dec. 17, 2010) (available at
http://dpb.virginia.gov/budget/buddoc11/index.cfm).

the fact dispelled the auditor's conclusion that 1st Stop had overbilled the government. We reject this rationale.

1st Stop was obligated to maintain documentation of its services as specified in the Provider Agreement. The Provider Agreement incorporates by reference the applicable regulations as well as the EDCD Manual. These obligations constitute an integral part of the contract. The hearing officer, the Director, and the circuit court all concluded that 1st Stop's documentation was so poor that DMAS could not determine what services were rendered during the hours claimed, a conclusion amply justified by the record. The Director and the circuit court also correctly concluded that these failures of documentation were contrary to the Provider Agreement, particularly Chapters 4 and 6 of the EDCD Manual. For example, the Manual provides that "[a]ny paid provider claim that cannot be verified *at the time of review* cannot be considered a valid claim for services provided." EDCD Manual Chapter 6, p. 12 (emphasis added). The Manual also provides that "[i]f services billed to and paid by DMAS are not documented on the DMAS-90, DMAS will require the provider to refund Medicaid." EDCD Manual, Chapter 6, p. 12-13.

In response, 1st Stop argues that it is entitled to present evidence at the hearing to prove that it did not actually defraud the government. A provider is certainly entitled to present evidence at a hearing, as Code § 2.2-4020 expressly provides. But that evidence cannot be used to circumvent or displace the documentation required by the clear terms of the Provider Agreement or the penalties associated with the failure to follow those contractual requirements. The evidence established that 1st Stop failed to maintain separate records for respite care and for personal care or to differentiate which service was provided, as it was required to do. "[C]ourts will not rewrite contracts; parties to a contract will be held to the terms upon which they agreed." Bank of Southside Va. v. Candelario, 238 Va. 635, 640, 385 S.E.2d 601, 603 (1989). The same

holds true in an administrative context. To hold otherwise would ignore the plain terms of the Provider Agreement and the Manual, incentivize sloppy recordkeeping, and increase the cost and complexity of audits.

D. Assuming principles of contract law apply, 1st Stop's documentation failures were material.

1st Stop argues that even if it is in breach, its failures of documentation do not constitute a *material* breach of the contract. A material breach "is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." Psychiatric Solutions of Va., Inc. v. Finnerty, 54 Va. App. 173, 190, 676 S.E.2d 358, 367 (2009) (citation omitted). 1st Stop points to five factors that assist courts in determining whether a breach is material, and argues that each of those factors favors its position.[4] DMAS responds that in this highly regulated context, ordinary principles of contract analysis must yield to specific regulations.

We need not on these facts decide whether, as a categorical matter, the principles of material breach of contract apply to Provider Agreements.[5] We assume, without deciding, that they do. In this setting, however, adequate documentation of services provided is essential for the efficient functioning of the Medicaid program. The Provider Agreement, applicable

---

[4] Those five factors are: (1) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (2) the extent to which the injured party can be adequately compensated for the part of the benefit of which he was deprived; (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (4) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account all of the circumstances, including any reasonable assurances; and (5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. Restatement (Second) of Contracts § 241 (1981). Our Supreme Court often has cited the Second Restatement as authoritative, including this particular provision. See Horton v. Horton, 254 Va. 111, 116, 487 S.E.2d 200, 204 (1997).

[5] Therefore, we address DMAS's assignment of cross-error only to the extent necessary to resolve this case. See Morris v. City of Virginia Beach, 58 Va. App. 173, 180, 707 S.E.2d 479, 482 (2011) (appellate courts should resolve cases on "the best and narrowest ground available" and strive to resolve cases "on what we conceive to be the determinative points" (citations omitted)).

regulations, and the EDCD Manual all require providers to maintain adequate documentation. The required documentation must be maintained prior to and at the time of the audit, not through reorganizing and explaining following a failed audit. When, as an undisputed factual matter, a provider's documentation is "abysmal" to the point where the auditor cannot determine that certain payments were justified, then, under those circumstances, the provider is in material breach of the contract.

1st Stop also contends that the fault lies with *the auditor*. The Provider Agreement requires 1st Stop "to keep such records as DMAS determines necessary." When 1st Stop failed to maintain records as required by the Provider Agreement, it was in breach of contract and DMAS may, as the contract provides, order retraction of payment. The fault is not with the auditor, but with 1st Stop.

Finally, 1st Stop argues that the retraction of payment for services rendered is an "extreme remedy." The EDCD Manual, however, as well as 12 Va. Admin. Code § 30-120-930(A)(17), which govern this contract, repeatedly warn providers that a failure to properly document services may result in retraction of payment. By agreeing to follow the terms of the Agreement, 1st Stop agreed to its terms. DMAS was therefore entitled to enforce the contract.

CONCLUSION

The judgment of the circuit court is affirmed.

<u>Affirmed.</u>