# CIRCUIT COURT OF THE CITY OF NORFOLK

Sentara Enterprises,
d/b/a Sentara Medical Equipment

     v.

Department of Medical
Assistance Services

September 13, 2012

Case No. (Civil) CL12-2742

BY JUDGE MARY JANE HALL

This matter comes before the Court on Sentara Enterprises' appeal of an adverse decision by the Virginia Department of Medical Assistance Services issued on February 6, 2012. For the reasons stated herein, the

Court reverses the agency action at issue in this matter, specifically, the Department's retraction of $190,111.71 from Sentara.

## Factual Background

This case is before the Court on Sentara's appeal of the decision by the Department of Medical Assistance Services to retract $190,111.71 paid to Sentara for the provision of enteral nutrition supplements to Virginia Medicaid beneficiaries. The Department does not dispute that Sentara provided these services to individuals qualified for Medicaid, nor that the services were medically necessary. Instead, the Department based this retraction on the assertion that Sentara did not comply with state regulations governing supporting documentation for the provision of these services between March 1, 2008, and March 1, 2010. The Department claims two deficiencies in the documentation during this time period, (1) that all Nutritional Status Evaluation forms (known as DMAS-115) which were completed and signed by the registered dietitian who conducted the assessment were not also signed by a physician and (2) that the assessor neglected to include the height of the patient on some of these forms as well. Because of these deficiencies, the Department asserts that it must retract all funds paid to Sentara for the nutritional supplements.

## Standard of Review

The Virginia Administrative Process Act (VAPA), Va. Code § 2.2-4000, *et seq.*, gives this Court jurisdiction to review the actions of administrative agencies. The burden is on the complaining party to prove that the agency committed error at law. Va. Code § 2.2-4027. Such errors exist when: (1) the agency did not act in accordance with law, (2) the agency made a procedural error which was not harmless error, or (3) the agency did not have sufficient evidential support for its findings of fact. *Virginia Bd. for Branch Pilots v. McCrory*, 60 Va. App. 373, 378, 727 S.E.2d 795, 797 (2012). The reviewing court must limit its review to the agency record, and with respect to any issues of fact, the court is limited to ascertaining whether there is "substantial evidence in the agency record upon which the agency as the trier of the facts could reasonably find them to be as it did." Va. Code § 2.2-4027.

In reviewing decisions by the Department of Medical Assistance Services, the Court accords great deference to the agency's interpretation of the laws applicable to "the reimbursement due qualified providers for their reasonable costs incurred while delivering health care services." *Department of Med. Assistance Servs. v. Beverly Healthcare*, 41 Va. App. 468, 481, 585 S.E.2d 858, 865 (2003). The Court of Appeals has cautioned, however, that "deference is not abdication, and it requires [the Court] to

accept only those principles of agency interpretations that are reasonable in light of the principles of construction courts normally employ." *Avante at Roanoke v. Finnerty*, 56 Va. App. 190, 197, 692 S.E.2d 277, 280 (2010) (quoting *Board of Supervisors v. State Bldg. Code Tech. Review Bd.*, 52 Va. App. 460, 466, 663 S.E.2d 571, 574 (2008)). Accordingly, courts give no deference to an agency's interpretation of its regulations that is "arbitrary and capricious." *Horne v. Commonwealth*, 57 Va. App. 709, 718, 705 S.E.2d 535, 539 (2011). Thus, this Court will apply ordinary principles of statutory interpretation to determine whether the Department's interpretation of its regulations is arbitrary and capricious, meaning that it is " 'unreasonable' or 'without determining principle.'" *Id.* (quoting *Williams v. Commonwealth of Va. Real Estate Bd.*, 57 Va. App. 108, 135, 698 S.E.2d 917, 930 (2010)).

*Discussion and Findings*

I. *The Department's interpretation of its regulations so as to require a physician's signature on the DMAS-115 form is arbitrary and capricious.*

The Department requires Medicaid providers of durable medical equipment and supplies, which includes enteral nutrition supplements, to provide a Certificate of Medical Necessity, completed and signed by a physician, confirming the medical necessity of the equipment or supplies. *See* Agency Record (A.R.), Binder 1, Tab 13, Provider's Exhibits (P.E.) 4. During the time relevant to this appeal, the Department also required providers to submit completed DMAS-115 forms, which record the nutritional status of a patient on a form created by the Department. *See* A.R., Binder 1, Tab 13, P.E. 3. Sentara concedes that these forms do not contain a physician's signature but asserts that the DMAS-115 form itself did not state that it required a physician's signature and that the regulations regarding this requirement are unclear. The Final Agency Decision adopted the Hearing Officer's finding that the Department's regulations, along with the Manual for Durable Medical Equipment providers, required Sentara to include a physician's signature on the DMAS-115 form. The Director ruled that Sentara was not entitled to be paid for the supplements that it provided to the Medicaid patients at issue.

The question is thus whether the regulations require a physician to add a signature to a DMAS-115 form that was completed and signed by a registered dietitian. The DMAS-115 form itself states at the top of the page, "Instructions for completion are on the reverse side of the form." Those instructions, as relating to Section G, "Assessor Information," state:

> The forms must be completed by a physician, registered nurse, or dietitian. The person completing the form must sign and date the form here. The DMAS-115 must be signed and dated by the assessor (physician, registered nurse, or dietitian) within

sixty days of the DMAS-115 begin service date; otherwise, the DMAS-115 will become valid an [sic] the date that the form is signed by the assessor.

A.R., Binder 1, Tab 13, P.E. 3.

Thus, the form tells the provider that it must follow the instructions appearing on the reverse side; it does not refer to or incorporate instructions that may appear anywhere else, including in any relevant regulation, and the very instructions that the provider is directed to follow contain no reference whatever to a requirement that a physician must also sign a form that has been completed and signed by a registered nurse or dietitian. The only direction provided regarding signature is that "the person completing the form must sign and date the form."

Contrasting the instructions on the DMAS-115 with those that appear on the required companion form Certificate of Medical Necessity (also known as DMAS-352) reveals key differences. The DMAS-352 form states on the bottom in Section IV: "PHYSICIAN CERTIFICATION (MUST BE SIGNED AND DATED BY PHYSICIAN)." The instructions on the reverse of the form state:

> *Section IV: PHYSICIAN CERTIFICATION . . . Must* be signed and fully dated by physician (**NOTE**: Attached physician prescription will **_not_** be accepted in lieu of physician signature/ date on this form); IF ORDERS FOR DME SERVICE ARE WRITTEN ON BOTH SIDES OF FORMS, PHYSICIAN _MUST_ SIGN/DATE *BOTH* SIDES OF FORM.

A.R., Binder 1, Tab 13, P.E. 4 (emphasis, including bold type, italics, and underscored words, in original).

Obviously the Department knows how to direct its providers to secure physician signatures on documents that require them. Nobody reviewing a blank DMAS-352 (Certificate of Medical Necessity) would harbor any doubt about that requirement. The DMAS-115, which must be submitted as supporting documentation for the DMAS-352 and would thus be expected to be completed contemporaneously by the provider, is silent as to the very requirement that inspired bold type, italics, capital letters, and multiple underscored words in the DMAS-352. Nonetheless, the Department takes the position that it may generate a form, direct the provider to comply with detailed instructions on the reverse of the form, and thereafter retract payment from one who complied with those instructions but not with an additional requirement that is nowhere mentioned in those instructions.

Two Department regulations address this issue. 12 VAC 30-50-165 covers reimbursement for durable medical equipment and supplies suitable for use in the home, including the nutritional supplements in this case, and

requires that all such equipment and supplies be obtained pursuant to a proper Certificate of Medical Necessity. The regulation states that the "CMN and any supporting verifiable documentation must be complete (signed and dated by the physician). . . ." 12 VAC 30-50-165(A)(5) (2002); *see* 18 Va. Reg. Regs. at 1313 (January 28, 2002), A.R., Binder 1, Tab 13, P.E. 2, Subtab 4. The 2002 versions of 12 VAC 30-50-165 and 12 VAC 30-60-75 were the applicable versions of those regulations during the time period at issue in this appeal. Although Sentara suggests that the parenthetical phrase could refer back only to the Certificate of Medical Necessity and not to the "supporting verifiable documentation," which would include a DMAS-115, the plainer interpretation supports that all documents must be physician-signed.

In contrast, 12 VAC 30-60-75, which governs reimbursement for durable medical equipment in general, states:

> Supporting documentation is allowed to justify the medical need for durable medical equipment and supplies. Supporting documentation does not replace the requirement for a properly completed [Certificate of Medical Necessity] . . . and the medical practitioner providing the supporting documentation must be identified *by name and title*.

12 VAC 30-60-75(A) (2002) (emphasis added); *see* 18 Va. Reg. Regs. at 1317 (January 28, 2002), A.R., Binder 1, Tab 13, P.E. 2, Subtab 4. Addressing the very documentation discussed in 12 VAC 30-50-165, this regulation requires the licensed practitioner to identify herself by name and title with no mention of an additional requirement for a physician signature.

The language of these two regulations thus seems to contain two *different requirements regarding signatures.* Ordinarily, if the language of a statute is clear and unambiguous, a court will interpret the statute according to its plain meaning. *Virginia Dep't of Med. Assistance Servs. v. Patient Transp. Sys.*, 58 Va. App. 328, 336, 709 S.E.2d 188, 192 (2011). This principle applies equally to "the interpretation of regulations adopted by an administrative agency pursuant to statutory authority granted it by the legislature." *Id.* Two regulations which are both relevant must be read and construed together, if possible, so as to harmonize the provisions of each regulation. *Gilman v. Commonwealth*, 48 Va. App. 16, 30, 628 S.E.2d 54, 61 (2006). The Department argues that the two regulations may be harmonized by giving full effect to 12 VAC 30-50-165 because it applies to equipment used in the home and is therefore more specific to the supplements at issue. During argument at the hearing, the Department could not articulate how the supplements in this case differ because they are used in the home, thereby justifying the added reporting requirement. The Court is thus left with two regulations and one Department-issued form with specific instructions for

completion that, for no reason that was articulated by either party, seem to impose different requirements on providers of nutritional supplements.

When the language of a regulation is ambiguous, courts are given the task of interpreting it. Language is ambiguous if it can be understood in more than one way. *Virginia-American Water Co. v. Prince William County Serv. Auth.*, 246 Va. 509, 514, 436 S.E.2d 618, 621 (1993). The fact that two parties have differing interpretations of the same regulations tends to show that their meaning is difficult to ascertain. *Id.* Evidence in this case suggested that the Department itself has previously interpreted the regulation to be satisfied by the inclusion of a dietitian's signature with no additional physician signature. Witness Robin Sorensen testified that the Department's extensive audit of Sentara in 2008 did not result in any retractions of payment on the basis that the DMAS-115 forms lacked a physician's signature. Tr. (10/13/11) at 41, A. R., Binder 1, Tab 12. Evidence that the Department has interpreted the regulation differently in the past adds weight to the conclusion that the regulation is ambiguous. This Court thus finds that the regulations at issue in this case, 12 VAC 30-50-165 and 12 VAC 30-60-75, are ambiguous as to whether a physician's signature is required on supporting documentation as opposed to simply on the Certificate of Medical Necessity. This ambiguity is heightened when read together with the instructions the Department issued to providers for completing the two required forms, the DMAS-115, which specifically authorizes the form to be completed and signed by a registered dietitian with no mention of any requirement for a physician signature, and the DMAS-352 (Certificate of Medical Necessity) with its emphatic direction that a physician *must* sign the form.

When regulations are ambiguous, courts may interpret their meaning by giving effect to legislative intent, which requires the Court to look at the regulations as a whole, including extrinsic evidence of the regulatory history. *Commonwealth v. Fairfax County Sch. Bd.*, 49 Va. App. 797, 803-04, 645 S.E.2d 337, 340 (2007).

Sentara's evidence of the regulatory history of the DMAS-115 was uncontradicted by the Department. At all times relevant to this appeal, the Department has required providers to submit the Certificate of Medical Necessity for enteral nutrition supplies together with the DMAS-115, the Nutritional Status Evaluation Form created by the Department. Prior to the version of the DMAS-115 at issue in this case, the Department promulgated a version dated May 19, 1995, which also required that an assessor sign and date it. The instructions on the back of that form stated "The person completing the form signs here. If the physician uses the form to record his/her order but did not complete the form, both the assessor and physician must sign." DMAS-115 (5/19/95), A.R., Binder 1, Tab 13, P.E. 2, Subtab 11, Attached Exhibits at 6. These instructions clearly do not require a

physician's signature *unless* that form was to serve as the actual order of durable medical equipment.

Following the 1995 version of the DMAS-115, the General Assembly changed Va. Code § 32.1-325 to require a Certificate of Medical Necessity for every order of durable medical equipment under Medicaid. *See* Va. Code § 32.1-325(9) (1998), A.R., Binder 1, Tab 13, P.E. 2, Subtab 8 at 7. Thus, a physician-signed DMAS-115 could no longer serve as the order. The Department then changed its regulations to comply with this requirement and introduced the first version of the regulation that it now contends requires the retraction of payment to Sentara:

> The [Certificate of Medical Necessity] and any supporting verifiable documentation must be complete (signed and dated by the physician) and in the provider's possession within 30 days from the time the ordered [durable medical equipment] and supplies are initially furnished by the [durable medical equipment] provider.

12 VAC 30-50-160(D)(1)(e) (2002); *see* 18 Va. Reg. Regs. at 2146 (April 29, 1998), A.R., Binder 1, Tab 13, P.E. 2, Subtab 6. This regulation governed all home health services which included durable medical equipment. In 2002, durable medical equipment was removed to its own specific regulation, 12 VAC 30-50-165, which now governs the issues in this case.

In advance of this change, Robert C. Metcalf, then the Director of the Department, commented on the differences. He wrote:

> The [Certificate of Medical Necessity] may be completed by the [durable medical equipment] provider and other health care professionals, but must be signed and dated, at the time of service, by the attending physician. Supporting documentation may be attached to the [Certificate of Medical Necessity]; however, the physician's order, in its entirety, must be recorded on the [Certificate of Medical Necessity].

Regulatory Review Summary at 19, A.R., Binder 1, Tab 13, P.E. 2, Subtab 8. When the Director described the new regulation, he explicitly noted that the Certificate of Medical Necessity had to be signed by a physician with no such comment about the supporting documentation. More important are Director Metcalf's comments regarding required forms: "No new forms are required to implement this proposed regulation. DMAS intends to continue using the . . . DMAS-115, Nutritional Status Evaluation Form (attached)." *Id*. at 20. The form attached was the 1995 version of the DMAS-115 which stated "The person completing the form signs here. If the physician uses the form to record his/her order but did not complete the form, both the

assessor and physician must sign." DMAS-115 (5/19/95), A.R., Binder 1, Tab 13, P.E. 2, Subtab 11, Attached Exhibits at 6.

The Director's comment that the existing 1995 form was fully sufficient to implement the regulatory language, indicates that the regulation was not intended to require a physician's signature on the DMAS-115 in every instance. The Department changed the DMAS-115 in October 1999 to the version that Sentara was using for the claims at issue. The 1999 version eliminated the opportunity for a physician to sign a DMAS-115 in order to record his order, because, as of 1998, the regulations required a signed Certificate of Medical Necessity for every order. Tr. (10/13/11) at 289-93, A. R., Binder 1, Tab 13, P.E. 3. As discussed, the form makes no mention of a requirement that a physician sign the form unless he or she actually prepared it. Moreover, there is no additional space or line provided for this additional signature should it be necessary.

The Department's Durable Medical Equipment and Supplies Manual (DME Manual) in effect during the relevant period, which appears in the Agency Record in Binder 1, Tab 13, P.E. 2, Subtab 9, does not communicate the Department's view that the DMAS-115 absolutely requires a physician's signature to be valid:

> The DMAS-115 form is required for all individuals receiving nutritional supplements, and the DMAS-115 must be signed and dated by the assessor within 60 days of the DMAS-115 begin service date. If the DMAS-115 is not signed and dated by the assessor within 60 days of the DMAS-115 service date, the DMAS-115 will not become valid until the date of the assessor's signature.

DME Manual, Chpt. IV (June 5, 2006) at 16, A.R., Binder 1, Tab 13, P.E. 2, Subtab 9.

This language about when and how the DMAS-115 will become "valid" is not consistent with the Department's current position. If the Department had intended by the regulation to mean that the DMAS-115 in every case had to be signed by a physician, then the DME Manual would not have instructed that it becomes valid when signed by a dietitian or nurse practitioner. It should have said that it became valid when signed by the physician, or signed by both, if that is what the regulation required.

The same section of the DME Manual quoted above lists the items that must be included on the DMAS-115, including as the tenth item on the list: "Physician signature and date in accordance with criteria for support documentation." *Id.* at 17. Again, if the DMAS-115 must in every case be signed by a physician, then the DME Manual could have put the period halfway through that last item and stated simply "Physician signature and

date." The modifier, "in accordance with criteria for support documentation," suggests that sometimes the signature is required and sometimes not.

As discussed, the Department did make this additional signature requirement clear in the context of the regulations addressing the Certificate of Medical Necessity. That regulation tracks the language of Va. Code § 32.1-325 and states "The [Certificate of Medical Necessity] may be completed by the [durable medical equipment] provider or other appropriate health care professionals, but *it shall be signed and dated by the attending physician. . . .*" 12 VAC 30-50-165(A)(7) (2002 (emphasis added); *see* 18 Va. Reg. Regs. at 1314 (January 28, 2002), A.R., Binder 1, Tab 13, P.E. 2, Subtab 4. Despite the Department's ability to plainly state this requirement in regards to the Certificate of Medical Necessity, no such clarity is found in the regulations governing the DMAS-115.

Agency action is arbitrary and capricious when it is taken "without consideration or in disregard of facts or law or without determining principle." *School Bd. of the City of Norfolk v. Wescott*, 254 Va. 218, 224 (1997). The Court finds that the Department's interpretation of its regulations and the directives included on its required forms to require a physician's signature *in addition to* the dietitian's signature on the DMAS-115 form is arbitrary and capricious. As such, the Department's retraction of payments for those forms on which a physician's signature is not provided is reversed.

II. *The Department erroneously found that the alleged deficiencies on the DMAS-115 forms were a material breach by Sentara.*

The Department rejected Sentara's contention that it did not materially breach the Participation Agreement and forfeit its right to any payment by submitting forms that lacked a physician's signature. The Director agreed with the Hearing Officer's legal conclusion that contract principles were inapplicable to this dispute, and it further concluded as a matter of fact that the signature omissions were material breaches. The Court rejects that legal conclusion and holds that contract principles are applicable to this dispute. The Court further holds that the Department had an insufficient evidential support for the factual finding that the omissions were material.

The Department relied upon *Psychiatric Solutions of Va., Inc. v. Finnerty*, 54 Va. App. 173, 676 S.E.2d 358 (2009), a decision that it interprets as permitting an investigation into the materiality of a provider's breach only when the provider has violated some provision found in the Department's Manual rather than in a governing regulation. The Director wrote:

> The ruling in *Psychiatric Solutions* does not require that all of the Department's overpayment determinations be decided under contract law principles. In *Psychiatric Solutions*, the Department cited as the basis for an error reason [sic] a

provision which was only found in the Department's Manual. 54 Va. App. at 190. Because the Manual was the sole source of the policy, the Court found that the Participation Agreement was the only link between the Provider and the DMAS policy at issue. *Id.* The Court concluded that the Provider entered into a contract by executing the Participation Agreement with the Department, and that contract law principles applied to overpayments that stem from provisions solely found in the Manual. *Id.* Accordingly, the Hearing Officer was correct in stating that *"Psychiatric Solutions* does not apply contract law principles and the doctrine of material breach in a case where there is an underlying regulation that controls the result . . . as is the case here."

Final Agency Decision at 10, A.R., Binder 1, Tab 25 (quoting Recommended Decision of Hearing Officer at 11, A.R., Binder 1, Tab 21).

This Court does not interpret *Psychiatric Solutions* as establishing that brightest of bright-line tests that the Department has perceived, to wit, if a provider violates some obligation found in a regulation, no matter how *de minimis* the violation, it forfeits its right to receive any compensation whatever for the services that it provided to Medicaid beneficiaries. On the other hand, if the provider violates an obligation found in a Department manual and not in a regulation, the Department may apply contract principles to evaluate the materiality of the breach. *Psychiatric Solutions* did not forbid a materiality analysis when the omission by a provider relates to a requirement imposed by regulation; it merely noted that the obligation at issue in that case appeared only in the Department Manual and not in a statute or regulation. 54 Va. App. at 190.

The statutes and regulations governing Medicaid reimbursement only apply to providers who have signed participation agreements in which they contractually agreed to follow those statutes and regulations. *See* Durable Medical Equipment and Supplies Participation Agreement: "The provider agrees to comply with all applicable state and federal laws, as administrative policies and procedures of [DMAS] as from time to time amended." A.R., Binder 2, Tab 8, ¶ 8. If a provider must comply with Medicaid regulations only because it has agreed to do so, then principles of contract law should apply to any alleged violation, whether found in a statute, a regulation, or some other agency guidance document. The materiality analysis must focus not on the source of the standard breached but on the consequences of the breach.

### 1. *Retractions relating to lack of physician's signature*

This Court finds that there is no substantial evidence to support the Department's factual determination that the submission of nutritional status evaluations that had been completed and signed by the dietitian who assessed the patient, but not by a physician, is a material breach by the provider. As discussed above, the Department forms at issue were completed and signed by the assessor and maintained along with the Certificates of Medical Necessity, which were duly signed by the ordering physician. The forms were fully consistent with those physicians' orders. Dr. John Patterson testified that there was no clinical reason why a physician who had not conducted the assessment would sign the form. Tr. (10/13/11) at 66, A.R., Binder 1, Tab 12.

Virginia law defines a material breach of contract: "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Horton v. Horton*, 254 Va. 111, 115, 487 S.E.2d 200, 204 (1997). The essential purpose of the Participation Agreement is to provide medically necessary services to Virginia's Medicaid population. Documentation requirements are important to the extent that they relate to confirming the medical necessity of the services provided, but a minor deviation from a documentation requirement that has no impact whatever on medical necessity does not defeat the essential purpose of the contract. The patients did receive the required assessments by an appropriate professional, and the medical necessity for the services was never in question. The Department's only witness did not provide substantial evidential support for any contrary conclusion.

The substantial evidence standard applicable to judicial review of agency decisions has been defined as "such relevant evidence as a reasonable mind *might* accept as adequate to support a conclusion." *Virginia Real Estate Comm'n v. Bias*, 226 Va. 264, 268, 308 S.E.2d 123 (1983) (emphasis in original). A court may reject an agency's findings of fact "only if, considering the record as a whole, a reasonable mind would necessarily come to a different conclusion." *Id.* The Court has considered the record as a whole and finds no basis whatever for determining that the lack of physician's signature on the DMAS-115 form was a failure so fundamental to the contract that the omission "defeats an essential purpose of the contract." *Horton*, 254 Va. at 115. The Case Decision itself did not address the materiality of the breach. The Recommended Decision of the Hearing Officer relied on Mr. Reilly's testimony, which failed to support any conclusion that Sentara defeated an essential purpose of the contract by submitting DMAS-115 assessments signed by the registered dietitian who conducted the assessment but not a physician.

Therefore, this Court holds as an additional basis for the reversal of the retraction of payment for the enteral nutrition supplements that Sentara's deviation as relating to the missing physician signatures was *de minimis* and not material.

## 2. *Retractions relating to missing height information*

The Department retracted payment for a subset of Sentara's claims for the additional reason that those DMAS-115 forms failed to include data for the patient's height. *See* Final Agency Decision at 9-10, A.R., Binder 1, Tab 25. Again, the Department rejected Sentara's contention that the omission of height information was not a material breach of contract on a legal and a factual basis; the Department concluded as a matter of law that contract principles were inapplicable to the instant dispute, and it further concluded as a matter of fact that the omission of height data was a material breach by Sentara. For the reasons previously stated, the Court holds that contract principles are applicable to this dispute. The Court finds that there is no substantial evidence to support the Department's factual determination that inclusion of height on the form is a material obligation of the provider.

The Court has already discussed its interpretation of *Psychiatric Solutions* and that it does not accept the artificial demarcation between statutory/regulatory violations on the one hand and policy/manual violations on the other. Nonetheless, even if the Department has interpreted *Psychiatric Solutions* correctly, it has misapplied the holding to Sentara's failure to provide height data because that requirement appears only in the Department's DME Manual and not in any statute or regulation. Under its own interpretation of *Psychiatric Solutions*, the Department must conduct a materiality analysis.

The Department elevated the status of the height data requirement by concluding that it does appear in a regulation. The cited regulation, however, does not specifically mandate that a provider include height on the DMAS-115; it provides generally "The [Certificate of Medical Necessity] and any supporting documentation must be complete. . . ." 12 VAC 30-50-165(A)(5) (2002); *see* 18 Va. Reg. Regs. at 1313 (January 28, 2002), A.R., Binder 1, Tab 13, P.E. 2, Subtab 4. The Department concluded that those DMAS-115 forms lacking patient height were incomplete, in violation of that regulation.

A general or catch-all regulation that requires providers to do what the Department tells them to do should not establish a strict liability standard among providers and permit all payment to be withheld for any omission of any nature. The holding of *Psychiatric Solutions*, even as limited by the Department's interpretation, would be undercut entirely if the Department could routinely identify a regulation that requires providers to comply with its Manual; every standard not found in a regulation would automatically

become a standard that is found in that regulation, such that no materiality analysis would ever be warranted. In *Psychiatric Solutions,* the provider failed to document that it had provided twenty-one planned, therapeutic interventions per week for its inpatient pediatric psychiatric patients. The specific requirement for twenty-one interventions appeared in a Department manual rather than a regulation. 54 Va. App. at 190. Similarly, the specific requirement to provide height data appears only in a Department manual and not in any regulation, such that the identical reasoning should apply.

Thus, the Court finds that a materiality analysis is appropriate in this case, whether *Psychiatric Solutions* is given the limited reading urged by the Department or whether such analysis is proper in cases involving any alleged violations by the provider.

With very little discussion of the issue, the Hearing Officer noted in his Recommended Decision that the height requirement was material, A.R., Binder 1, Tab 21, at 11-13, and the Director accepted that finding in her Final Agency Decision. A.R., Binder 1, Tab 25, at 3. Neither decision addressed how Sentara's omission of that information amounted to a material breach of contract.

The essential purpose of Sentara's Participation Agreement is to provide covered Medicaid services to Virginia's Medicaid beneficiaries. Neither the Recommended Decision nor the Final Agency Decision included any discussion whatsoever of whether or how the omission of height data from certain nutritional status evaluation forms defeats an essential purpose of Sentara's agreement to provide enteral nutrition to those patients. The Court holds that the Department's finding about the materiality of the height requirement is not supported by substantial evidence. The Department's only witness was Timothy Reilly, a registered pharmacist and contract auditor for the Department. The Hearing Officer found the witness to be "credible, consistent, and compelling." Recommended Decision of Hearing Officer at 5, A.R., Binder 1, Tab 21. Relying on Mr. Reilly's testimony, the Hearing Officer found that the height information is "material because it allows a calculation of the body mass index, a calculation professionally performed by pharmacists." *Id.* at 13.

On direct examination, Mr. Reilly's testimony suggested that a body mass index calculation by the Department could influence a decision about the medical necessity for the prescribed enteral nutrition: "And knowing that if the patient's weight is increasing, we know with that height we can make that determination [body mass index], is this actually working for the patient. If their weight is not increasing or staying the same, then there needs to be an adjustment to this formula in this case." Tr. (10/13/11) at 170, A.R., Binder 1, Tab 12. On cross-examination, however, Mr. Reilly admitted that he could not recall whether he had ever calculated body mass index from information recorded on the nutritional status evaluation and that his audit was not a review for medical necessity but merely for completeness.

A witness who admits that his sole concern at audit is whether the forms are complete does not provide substantial evidential support for the contention that the essential purpose of a Participation Agreement is defeated when one space on the form is left blank. Read in context, Mr. Reilly's supposition that the height requirement permitted a calculation of body mass index sounds more like his personal theory on why the data is required, as the Hearing Officer himself suggested in the following colloquy with counsel for Sentara:

> Counsel: [Mr. Reilly] said the policy is they have to have this information on these documents so that the department is able to confirm medical necessity. What I'm asking is did they actually use the documents for that purpose.
>
> Hearing Officer: One of the reasons he was giving as a backup, but I also understood him to be also testifying look, if the height's not there, it's deficient, and that's what we cited for. . . . What you're challenging with, it is the rationale he gave. Let's just say his rationale was wrong. If he understands the policy to be that the height has to be there, and he got the rationale wrong, but that's the policy, how does it help you if the rationale is wrong? He's right on the first part.

*Id.* at 214.

Mr. Reilly offered no reasoning as to how body mass index was indicative of medical necessity. The DME Manual confirms that the Department covers enteral nutrition only when the supplement is the sole source of nutrition, meaning that "the recipient is unable to tolerate (swallow or absorb) any other form of oral nutrition." DME Manual, Chpt. IV (June 5, 2006) at 15, A.R., Binder 1, Tab 13, P.E. 2, Subtab 9. If patients are receiving enteral nutrition because they are unable to receive any other form of nutrition, then their need for same would not seem to be related to their body mass index. This testimony by Mr. Reilly provided no evidential basis for a conclusion that taking and recording a patient's height was an essential purpose of Sentara's Participation Agreement.

In contrast, Sentara presented the testimony of physician John Patterson, who has twenty years of experience, including the treatment of patients requiring enteral nutrition supplements. He explained that patients receiving enteral nutrition are those who have medical problems that prevent them from taking nutrition on their own. He testified firmly that consideration of the patient's height is not necessary for the determination of medical necessity for enteral nutrition. *Id.* at 58. He explained:

A. We base our judgment on the total clinical picture of the patient, and a lot of these people are very restricted. They can be in bed, contracted, very difficult to or impossible to get any kind of accurate height or length information. So we go by our eyes, our clinical judgment as far as if there's malnutrition that would benefit from enteral nutrition.

Q. So for those patients where you can't determine a height or you can't measure accurately, it's absolutely possible to determine medical necessity and issue an accurate order?

A. Absolutely.

*Id.* Responding to the contention that body mass index is necessary to evaluate the medical necessity for the order, Dr. Patterson said "the body mass index is just a measure of weight compared to height, and it is not always accurate as far as giving a good picture of what the person's health is like, what the nutritional status is like." *Id.* at 59. He testified in Sentara's rebuttal case "So, following things like height on the DMAS-115 forms does not really clinically give you a good idea even of whether or not the nutrition is adequate, appropriate, or unnecessary. So mainly what we would look at is the weight, the size of the person. That is something we know we can get regardless." *Id.* at 263. He went on:

Q. There was a suggestion made that it might be possible to measure the height of a patient using a tape measure, or even if they were in a contracted state, you could get an estimate, and then an estimate – it was inferred that an estimate would be better than no height at all. Do you agree with that?

A. No. I don't think it's pertinent to the health or the looking out for the welfare of the child. The only thing you can really reliably follow is going to be weight.

Q. Is there any clinical utility to an estimate of height in those circumstances?

A. No, because the age and size will give you – the age and the weight will give you a good idea of where the child stands, but, in a lot of these cases, you get the best idea of what's going on from your actual clinical examination of the child.

Q. Mr. Reilly testified something to the effect that having that height data permits DMAS to ensure that the safety and well-

being of the patients are being protected. From a clinician's perspective . . . would the height allow you to do that?

A. No. Not even following the height over time would you really be able to make a judgment whether or not the enteral feeding, for example, was medically necessary or whether it was – whether the goals were being met, the goals of treatment were being met.

*Id.* at 264-65.

The testimony of a non-physician witness who is not qualified to make determinations of medical necessity does not provide the required evidential support for the Director's decision that Sentara materially breached its Participation Agreement by omitting height data. Dr. Patterson, the only physician witness, testified dispositively that height data is not required to determine medical necessity. Therefore, the absence of height data does not impact the Department's ability to confirm that Medicaid beneficiaries received needed services. Moreover, the Department has never taken the position that the supplements were not medically necessary in any of the cases at issue here. Thus, the record simply lacks any evidential basis at all for the conclusion that the omission amounted to a material breach by Sentara. For these reasons, this Court finds that Sentara did not materially breach the Participation Agreement by omitting height data on the DMAS-115 forms and is entitled to payment for services provided.

III. *The Department violated Sentara's right to an impartial review by imposing a standard of deference on the process.*

The administrative review of an agency decision is governed by the Virginia Administrative Process Act (VAPA) and the basic law of the agency issuing the decision. Sentara demanded in this case an administrative review of the Department's decision to retract payment for enteral nutrition supplements. The VAPA requires that a fair and impartial hearing officer conduct a formal evidentiary review in which the provider has the right to be represented by counsel, to present oral and documentary evidence and rebuttal proofs, to cross-examine witnesses, and to submit written and oral argument. *See* Va. Code §§ 2.2-4020(C), (D); 2.2-4024(C). The party seeking administrative review has the burden of proof. The hearing officer is then required to recommend findings and a decision to the agency director, unless the agency regulations permit that hearing officer to render a decision, which is not the case here. *Id.*

Neither the VAPA nor any case authority interpreting the relevant statutory sections requires a hearing officer to give deference to the agency's fact witnesses and legal arguments made during the hearing. In this case,

however, the Department asserted repeatedly that the Hearing Officer was required to give deference to the testimony of its sole witness, a third-party contractor who has worked as an auditor for ACS Heritage, Inc., for seven years, paid solely to conduct Medicaid audits in Virginia. *See, e.g.,* DMAS Opening Brief (11/14/11) at 9, A.R., Binder 1, Tab 16 ("Mr. Reilly's Expert Interpretation must be given deference by the Hearing Officer."). Counsel for the Department argued that "the DMAS contractor does have the authority to speak for the Director in this forum." Tr. (10/13/11) at 120, A.R., Binder 1, Tab 12.

The Hearing Officer accepted these arguments, stating, "Despite the fact that this proceeding is an administrative hearing, the hearing officer must give deference to certain decisions of the Department to the same extent and for the same policy reasons that any judicial authority would defer to the decisions of the Department." Recommended Decision of Hearing Officer at 3, A.R., Binder 1, Tab 21. The Final Agency Decision adopted the same interpretation of law: "A hearing officer should give deference to the Department's interpretation of an issue falling within the Department's specialized competence if the interpretation is reasonable and not an arbitrary action constituting an abuse of DMAS' discretion." Final Agency Decision at 3, n. 5, A.R., Binder 1, Tab 25.

The requirement for *judicial* deference to agency decisions appears in the VAPA at Va. Code § 2.2-4027:

> Whether the fact issues are reviewed on the agency record or one made in the review action, the court shall take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted.

That statute applies only to a court's review of an official agency action. It has no application to a hearing officer's consideration of testimony or legal arguments furnished by an agency witness or lawyer. At the point in time when a hearing officer is conducting a formal review, the agency head has not yet exercised his or her "specialized competence." There has been no case decision by the agency to which the hearing officer may give deference.

A formal evidentiary hearing under Va. Code § 2.2-4020 is designed to protect the due process rights of aggrieved parties by permitting them to submit evidence and argument to an impartial hearing officer. See *Loudoun County Sch. Bd. v. Commonwealth Bd. of Educ.*, 45 Va. App. 466, 471, 612 S.E.2d 210, 213 (2005) ("The VAPA is intended to be a default or catch-all source of administrative due process, applicable whenever the basic law fails to provide process."). Due process must include, at a minimum, the

opportunity to be heard by a hearing officer who has no preference or bias for either side.

The Department argues that administrative deference is appropriate because "Medicaid law is complex and as the sole state agency authorized to administer the Medicaid program, DMAS has the competence, expertise, and authority to interpret Medicaid law, regulations, and policy." DMAS Reply Brief (8/8/12) at 4. The problem with that argument is that, at the formal hearing stage, the agency has not yet exercised that recognized competence. Only after the administrative review process is complete does the Director of the Department evaluate the recommended decision of the hearing officer and exercise "the experience and specialized competence" referred to in Va. Code § 2.2-4027.

The cases cited by the Department in support of its deference argument do not apply because they involved court reviews of final agency decisions where deference must be given, not formal hearings conducted before any agency decision had been made. *See Fralin v. Kozlowski*, 18 Va. App. 697, 447 S.E.2d 238 (1994); *Johnston-Willis, Ltd. v. Kenley*, 6 Va. App. 231, 369 S.E.2d 1 (1988). Sentara complains that the Department is enjoying an extra "thumb on the scale" at the formal review stage, resulting in a violation of law. This Court agrees.

The Court holds that an administrative agency decision is entitled to deference only when it reflects the considered decision of the agency head rather than the opinions of agency employees, contractors, witnesses, or legal counsel. The deference required in a judicial review may not be imported into the fact-finding process itself. In this case, the Department offered the testimony of only one witness, its auditor, and then directed the Hearing Officer to give deference to his interpretation of regulations and policies as though he "spoke for" the Director. Obviously, the Director makes the final agency decision. If the witness before the Hearing Officer truly "speaks for" the Director who will ultimately decide the case, it seems inescapable that the outcome of the review is predetermined and an aggrieved party is completely deprived of its due process right to an administrative hearing.

Because the Hearing Officer improperly gave deference to the Department's only witness, which deference the Director thereafter approved in her Final Agency Decision, Sentara has been deprived of due process. The agency's failure to accord due process to the aggrieved party supports reversal of the agency action under review.

## IV. *Sentara's Request for Attorneys' Fees*

Sentara seeks to present additional argument and evidence on its request for attorneys' fees. Counsel for Sentara is ordered to submit a legal memorandum with a supporting affidavit addressing the fee issue

on or before October 5, 2012. Counsel for the Department shall file its memorandum in opposition within twenty-one days from its receipt of Sentara's memorandum. If either side wishes to be heard in oral argument on the request, they shall schedule a hearing promptly with the Court; otherwise, the Court will make its decision from the written materials submitted.

## Conclusion

For the reasons stated, the Court reverses the agency action at issue in this matter, specifically, the determination that the Department has overpaid Sentara $190,111.71. Because the request for attorneys' fees remains pending, this is not a Final Order for purposes of appeal. This Order will become final by subsequent Order that disposes of the attorneys' fee request. Pursuant to Rule 1:13, endorsements by counsel are waived. The Clerk is directed to send copies of this Order to counsel of record. Counsel are directed to submit written objections to this Order within twenty-one days. It is so ordered.